

SOUTHERN DISTRICT OF MISSISSIPPI
FILED
MAY 4 2005
J. T. NOBLIN, CLERK
BY_____ DEPUTY

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
## HATTIESBURG DIVISION

| | | |
|---|---|---|
| **MARTHA A. CHEATHAM, ET AL** | * | **CIVIL ACTION** |
| | | |
| **VERSUS** | * | **NO. 2:02-893** |
| | | |
| **ALLSTATE INSURANCE CO.** | * | **JUDGE ELDON E. FALLON** |
| | | **MAGISTRATE JUDGE** |
| | | **WILKINSON** |
| | | **EDLA** |

### . ORDER & REASONS

Before the Court is the Motion of the Defendant for Summary Judgment on all of the

plaintiffs' Claims under the Age Discrimination in Employment Act ("ADEA"), Fair Labor

Standards Act ("FLSA"), for Failure to Pay Overtime Compensation Benefits, and for

Intentional Infliction of Emotional Distress under Mississippi law. The cause came on before the

Court for hearing with oral argument on Wednesday, April 27, 2005. After considering the

memoranda submitted by the parties, the argument of counsel, and all of the evidence, the Court

hereby GRANTS Defendant's Motion for Summary Judgment.

## I. BACKGROUND:

Plaintiffs in this case were Allstate employees who worked in the Jackson, Mississippi

office and who allege that they were wrongfully terminated based upon their age. The respective

Plaintiffs held the positions of managers, claims adjusters, and claims processors. In addition to their claims for age discrimination, they also claim that they routinely worked over 40 hours per week and are entitled to overtime compensation benefits and damages due to the Defendant's failure to timely pay those overtime benefits. Plaintiffs also aver that they are entitled to damages for intentional infliction of emotional distress as a result of the manner in which the Defendant terminated them.

Plaintiffs claim that they were long term, highly compensated and highly qualified employees who were recognized as outstanding employees many times over the course of their careers. Following is a list of the Plaintiffs in the case:

1. Plaintiff Martha Cheatham was born July 27, 1950, and began working for the Defendant on November 5, 1969. At the time of termination she was a Claims Representative or a Casualty Adjuster.

2. Plaintiff Sandra Gilbert was born March 20, 1955, and began working for the Defendant on May 14, 1973. At the time of termination she was a Unit Manager, Unrepresented Causality Unit.

3. Plaintiff Joy Ladd was born on October 11, 1962, and began working for the Defendant in 1988. At the time of termination she was a Claims Representative.

4. Plaintiff John McCoy was born on June 14, 1951, and began working for the Defendant on August 7, 1978. At the time of termination he was a Special Investigator.

5. Plaintiff Sherry Parham was born on November 19, 1954, and began working for the Defendant on July 8, 1974. At the time of termination she was a Claims Representative.

6. Plaintiff Carol Stegall was born on March 22, 1957, and began working for the

Defendant on March 6, 1978.  At the time of termination she was a Claims Processing Specialist.

7.  Plaintiff Betty Wells was born on August 4, 1949 and began working for the Defendant on January 12, 1970.  At the time of termination she was an Administrative Claims Manager.

8.  Plaintiff Joseph Johnston was born on October 12, 1953 and began working for the Defendant on August 4, 1984.  At the time of termination he was a Staff Claim Service Adjuster.

9.  Plaintiff John Kitch was born on April 10, 1957 and began working for the Defendant in December of 1987.  At the time of termination he was a Staff Claims Representative.

10.  Plaintiff Denise Peoples was born on September 1, 1957 and began working for the Defendant on June 23, 1975.  At the time of termination she was a Casualty Adjuster.

11.  Plaintiff Mikel Anthony was born on June 23, 1948 and began working for the Defendant on December 4, 1978.  At the time of termination he was a Senior Staff Claims Analyst.

The factual background of the case is quite complex and is briefly recited here.  In adjusting claims, the Defendant requires its claims personnel to document all of their actions in the claim file.  This includes all communications with insureds and claimants, interviews of witnesses, and negotiations with claimants and their attorneys.  The Defendant maintains that the accurate documentation of these activities is critical because it relies upon the claim file to confirm that it has complied with state law and regulations as well as provided good customer service.

3

Prior to 1995, claims personnel kept this information in handwritten diaries. In 1995, the Defendant implemented the Claim Development System ("CDS"), a software system comprised of a variety of screens or windows within which claims personnel document claims handling activities. The relevant screen to this litigation is the CDS 03 screen, which is titled the "Involved Person Statement." On that screen, claims personnel document general activity associated with the claim, such as telephone conversations and correspondence sent and received.

In June of 1997, the Defendant implemented an enhanced version of the CDS 03 screen which contained two dates: a headnote date that could be manually entered and a footnote date that was computer generated. Upon accessing the CDS 03 screen, the employee would first enter the headnote date manually at the top of the screen to indicate when the reported activity took place. The date on which the activity took place was not necessarily the date on which the information was entered into the system. The footnote date would indicate when the activity was recorded.

After describing the nature of the activity taken on the file, the employee would then press the "enter" key, which denoted completion of the entry. At that point, the computer would automatically insert the current date at the bottom of the screen. It was intended that neither the text of the entry nor the footnote date could be changed after this point.

In the spring of 2001, while preparing the defense in a bad faith case in Mississippi entitled *Lizana v. Allstate Insurance Company*, the Defendant's home office discovered that the computer-generated footnote date could be altered. During the discovery of this case, the Defendant discovered that one of its Jackson employees, Joan Vines, had learned of a way to alter the footnote date during a power surge. She found out that the footnote date could be

4

altered by manually entering a date and then prematurely turning off the computer before depressing the enter key. The employee could then reboot the computer and the manually entered footnote date would appear on the screen. This process enabled employees to backdate entries. Thus it appeared that files were being updated promptly when, in fact, they were not. By falsifying documents in this manner, employees were able to meet certain goals and obtain certain benefits and positive employment evaluation ratings.

After accidentally discovering how to alter the footnote date, Joan Vines showed the process to a number of her colleagues. Ultimately, Joan Vines was terminated for altering the footnote date as well as falsifying other information in claims files.

Plaintiffs claim that they engaged in this process because the Defendant increased their work load. In order to meet their increased work load, Plaintiffs claim they were forced to work in excess of eight hours per day and backdate entries or risk losing compensation and positive employment evaluation ratings.

After discovering that the footnote could be altered, the Defendant put together a multidisciplinary team composed of lawyers, corporate security personnel, and claims employees to conduct a national audit and investigation to determine if other employees were backdating entries, who those employees were, and the files that had been affected. The audit took place between September of 2001 to February of 2002. The audit team was able to determine that the problem was not a national problem, but was centered in the Jackson office, where there were 6,736 occasions of backdating on 2, 625 files.[1]

_____

[1]Specific to the Plaintiffs, the Defendant's audit revealed that Cheatham had 454 hits on 236 files; Parham had 420 hits on 156 files; McCoy had 409 hits on 170 files; Peoples had 357 hits on 199 files; Kitch had 214 hits on 129 files; Ladd had 720 hits on 278 files; Stegall had 890 hits on 382

In April and May of 2002, the Defendant supplemented the information discovered in the audit by conducting interviews with employees. Based on the results of the entire investigation, including the audit and the interviews, Judith Gaston, in-house counsel for Allstate, recommended that the Plaintiffs, as well as some other employees, be terminated. Based on Ms. Gaston's recommendations, Gary Mellini, Field Vice President, and Karleen Zuzich, Assistant Vice President for Human Resources, decided to terminate the Plaintiffs.

The terminations occurred on June 13 and 14, 2002. Those employees who were at work met individually at a hotel conference room with a local human resources representative. An armed security guard was present outside the hotel conference room. Those who were not at work were informed by telephone. Each was informed that they were being terminated for a violation of company policies. Each was asked to turn over their keys and company identification cards. Each was told that they were not permitted to return to the office to collect their personal belongings at that time.

Plaintiffs claim that, following termination, they were replaced by younger employees who possessed less skill, experience, and knowledge. The respective Plaintiffs individually filed charges of employment discrimination with the EEOC as required under 29 U.S.C. § 626(d). Plaintiffs claim they were fired based on their age. Plaintiffs claim that the alleged violation of Allstate guidelines and ethics is merely a pretext for their unlawful termination.

In their second claim for relief, Plaintiffs allege violations under the Fair Labor Standards Act. They claim they are owed compensation for any and all hours worked in excess of forty

---

files; Gilbert had 65 hits on 38 files; and Anthony had 9 hits on 7 files. (Gaston, 43-44, Ex. L, Def's Mtn.)

hours per week.  Thus, Plaintiffs seek back pay.

In their third claim for relief, Plaintiffs state that the Wage and Hour Division of the U.S.

Department of Labor, requires an employer who discharges an employee to pay compensation

due and owing to said employee by no later than the end of the following pay period.  As

Defendant refuses to pay any allegedly owed back pay, Plaintiffs claim Defendant is liable for

damages.

In their fourth claim for relief, Plaintiffs aver that the actions of Defendant constitute

intentional infliction of emotional distress.

Defendants deny these claims and assert that the Plaintiffs were properly terminated

because they participated in a scheme to backdate entries.  The Court shall consider each claim in

turn.

## II.  AGE DISCRIMINATION IN EMPLOYMENT ACT

Plaintiffs claim that they were improperly terminated based upon their age in violation of

the Age Discrimination in Employment Act ("ADEA").  29 U.S.C. § 621, *et seq*.  The ADEA

proscribes employers from failing or refusing to hire or discharging any individual on the basis of

age.  29 U.S.C. § 631(a)(1).  The Fifth Circuit has adopted the *McDonnell Douglas* burden

shifting standard to cases involving the ADEA.  *McDonnell Douglas Corp. v. Green*, 411 U.S.

792 (1973);  *See Meinecke v. H&R Block of Houston,* 66 F.3d 77, 83 (5th Cir. 1995) (establishing

that the same evidentiary procedure for allocating burdens of proof applies to discrimination

claims under both Title VII and the ADEA).  Under this shifting standard, the Plaintiff must

establish a prima facie case of discrimination.  *Id.*  If the plaintiff succeeds in establishing his

prima facie case, the burden shifts to the defendant to provide a legitimate, nondiscriminatory

7

reason for its actions. *Id.* If the defendant satisfies this burden, the burden shifts back to the plaintiff to prove that the proffered reasons are merely a pretext for discrimination. *Id.*

To establish a prima facie case, a plaintiff must show that:

(1) he is a member of a protected class;

(2) he was qualified for the position that he held;

(3) he suffered an adverse employment action; and

(4) he were replaced by someone younger.

*Id.*

The Fifth Circuit has held that the mixed-motive analysis used in Title VII cases is equally applicable in ADEA cases. *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004). In this "modified *McDonnell Douglas* approach," the plaintiff must still demonstrate a prima facie case of discrimination; the defendant then must articulate a legitimate, non-discriminatory reason for its decision to terminate the plaintiff; and, if the defendant meets its burden of production, "the plaintiff must then offer sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motive alternative)." *Id.* (internal citations omitted); *See also Keelan v. Majesco Software, Inc.*, 2005 WL 834481 (5th Cir. 2005) (applying modified *McDonnell Douglas* approach to national origin discrimination claim).

Establishing a prima facie case in the ADEA context does not per se defeat summary judgment. *See e.g. Keelan v. Majesco Software, Inc.*, 2005 WL 834481 (5th Cir. 2005) (affirming

8

district court's granting summary judgment to employer on ADEA claims). Rather, after the Plaintiff makes a prima facie showing, it is appropriate for the Court to proceed to the other prongs of the *McDonnell Douglas* test to determine if summary judgment is appropriate.

The Supreme Court has held that an inference of age-discrimination cannot be drawn from the replacement of one worker with another worker insignificantly younger. *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312-313 (1996). The ADEA was not intended to be vehicle for judicial second-guessing of employment decisions, nor was it intended to transform courts into personnel managers. *Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503, 1507-1508 (5th Cir. 1988). The ADEA cannot protect older employees from erroneous or even arbitrary personnel decisions, but only from decisions which are unlawfully motivated. *Id.* at 1508.

## A. Prima facie case

In this case, the parties do not dispute that the respective Plaintiffs were qualified for the positions they occupied and that they suffered an adverse employment decision by being terminated. Defendant also highlights, and the Plaintiffs do not dispute, that Plaintiff Ladd was thirty-nine years old when she was terminated. As the ADEA only applies to individuals who are at least 40 years of age, Plaintiff Ladd cannot establish a prima facie case under the ADEA. *See* 29 U.S.C. § 631(a). As such, Plaintiff Ladd's claims under the ADEA are hereby DISMISSED.

Defendant claims that Plaintiff Stegall cannot establish a prima facie case because she was replaced by someone who was the identical age. However, Plaintiffs dispute this fact. Resolving this factual controversy in the light most favorable to the Plaintiffs, the Court finds that the Plaintiffs have met their prima facie standard regarding Plaintiff Stegall. Defendants also

9

claim that Plaintiff Wells cannot establish a prima facie case because she was replaced by someone who was insignificantly younger. The Court, however, need not determine whether the age disparity in the case of Wells is significant or not because the Court finds that the Plaintiffs cannot show that the Defendants legitimate reason for the terminations is merely a pretext for discrimination or that age was a motivating factor in the Plaintiffs' terminations.

Regarding the remaining Plaintiffs, the parties do not dispute that they have established a prima facie case.

## B. Defendant's reasons for the terminations

Once the Court finds that the plaintiffs have established a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the terminations. *Meinecke,* 66 F.3d at 83. Defendant states that it terminated Plaintiffs Cheatham, Stegall, Gilbert, McCoy, Kitch, Anthony, Peoples, and Parham, because after its year long, intensive investigation, it determined that these employees engaged in a practice of altering the footnote date on the CDS 03 screen, which constituted falsifying documents in violation of company policy. Regarding Plaintiff Wells, Defendant states that it terminated her employment because it concluded that, while she was a manager, she had knowledge that her employees were altering the footnote date and took no action to stop it. Finally, Defendant claims that it terminated Plaintiff Johnston because it concluded that he was not forthcoming about his knowledge of the scheme during his interview.

Defendant further states that it reached the above conclusions after a year long, nation-wide investigation conducted by a multidisciplinary team composed of lawyers, corporation security personnel and claims employees. The investigation focused on the time period from

10

April 1, 1997 (before the implementation of the computer-generated footnote) through August 1, 2001 (the date on which the system was fixed to prevent alterations to the computer-generated footnote date). Defendant further claims that it expended considerable resources on this investigation because it considered the issue very important and a very serious threat to the integrity of its claims files.

Based on its investigation, the Defendant concluded that the problem was not a national problem, but that it centered in the Jackson, Mississippi office, where it identified 6,736 occasions on 2,625 files in which an employee manipulated the footnote date of an entry. In April and May of 2002, Defendant conducted interviews with those employees whom it determined had manipulated the footnote date. In their depositions, the following Plaintiffs testified that, during their interviews, they admitted to altering the footnote date: Cheatham (Cheatham, 60-61, Ex. J, Def's Mtn.); Gilbert (Gilbert, 88-89, Ex. M, Def's Mtn.); Kitch (Kitch, 76-77, Ex. O, Def's Mtn.); McCoy (McCoy, 52-57, 59-63, Ex. Q, Def's Mtn.); Peoples (Peoples, 64, Ex. T, Def's Mtn.); Parham (Parham, 100, Ex. S, Def's Mtn.); Stegall (Stegall, 41-42, Ex. U, Def's Mtn.).

Although Plaintiff Anthony denied altering the footnote date in his first interview, he was presented with the altered files in his second interview but could not offer explanations for all the hits. (Anthony, 61-64, Ex. I, Def's Mtn.; Gaston, 115, Ex. L, Def's Mtn.). Thus, the Defendant concluded that, in fact, Anthony had manipulated the files.

In her interview, Plaintiff Wells admitted that she had been shown the process for altering the date by Joan Vines. (Wells, 114, Ex. V, Def's Mtn.).

In his first interview, Johnston claimed that he was not aware of any employee making

11

changes to the computer system. (Johnston, 62-63, Ex. N, Def's Mtn.).  However, when

questioned in a second interview if a specific employee had told him about the alterations,

Johnston admitted that he had conversations regarding the altering of file documentation.

(Johnston, 66, Ex. N, Def's Mtn.).

    Based on the information gathered in the investigation and interviews, the Defendant,

based on the recommendation of in-house counsel Judith Gaston, made the decision to terminate

the Plaintiffs because it concluded that the footnote alteration scheme violated the Allstate Code

of Ethics,[2] the PCCSO Code of Ethics,[3] and Human Resources Policy Guide, Chapter 16.[4]

    The Court finds that the proffered reason for the terminations are legitimate and

nondiscriminatory.  The proper evaluation of claims is directly dependent on the accuracy of the

---

[2]The Allstate Code of Ethics provides, in pertinent part, under the heading "Falsification/Alteration of Documents":

> Employees may not alter any company document or state insurance department document or provide false information in those documents.  This includes information stored electronically.

[3]The PCCSO Code of Ethics provides, in pertinent part, under the heading "Company Records":

> Our company must created and maintain accurate and complete records to not only comply with local, state and federal laws, but also to ensure that they are available to defend the company's interest and business practices.  Records include paper documents, computer-based information, microfiche, and any other medium that contains information.  Each of us is responsible for ensuring that every document that we create is accurate and integrity of the data input into Company information systems that are used to create reports that record work product or work performance.  No employee may alter any Company or insurance department document or falsify information contained in any document.

[4]The Allstate Human Resources Policy Guide provides in Chapter 16 dealing with Terminations, under the caption, "Conduct Leading to Immediate Termination":

> Certain situations warrant a departure from normal procedures.  Following are examples of acts that could result in immediate termination.  This list is not all inclusive.
> - Dishonesty, such as theft, fraud, embezzlement, or falsification of Company documents.

information collected by claims examiners.  When the information on which the analysis is based

is undercut or contaminated, the whole process breaks down.  The Defendant undertook such an

intensive and broad investigation in order to prevent future situations such as those created by

Joan Vines.  Given the context, it is reasonable that the Defendant would view altering the

footnotes or any other kinds of departures from policy as a threat to the credibility of the

particular employees at issue.  If an employer loses trust in certain of its employees, it is certainly

within the rights of that employer to terminate those employees.  In this case, the Defendant

reasonably relied on information gathered during its investigation that these Plaintiffs undertook

extraordinary measures to alter the footnote date.  That the Plaintiffs had to undertake such

cumbersome actions to alter the footnote date bolsters the Defendant's concerns about the

integrity of these employees.  The Defendant viewed such actions as improperly altering and

falsifying documents in violation of its policies and terminated the Plaintiffs accordingly.  The

Court finds that the Defendant has met its burden of offering a legitimate, nondiscriminatory

explanation for the terminations.

## C.  Pretext/Mixed-motive

Once the Defendant articulates a legitimate, nondiscriminatory reason for the

terminations, the Plaintiffs are required to prove discrimination by offering evidence that the

Defendant's stated reasons are merely pretexts for age discrimination or that age was a

motivating factor in the Plaintiffs' terminations.  *Meinecke*, 66 F.3d at 83.

Plaintiffs propound a number of arguments in support of their contention that the

Defendant's stated reason for the termination were not legitimate.  The arguments fall into three

basic categories:  (1)  the Defendant did not really believe that the Plaintiffs were falsifying

13

documents; (2) the Defendant's hirings around the time of the Plaintiffs' terminations support a finding of age discrimination; and (3) similarly situated younger employees were treated differently from the Plaintiffs.

The first argument above goes to the question of pretext, while the second and third arguments go to the question of mixed motive.

## 1.  Whether the Defendant believed that the Plaintiffs were falsifying documents?

In support of their argument that the Defendant did not really believe that the Plaintiffs were falsifying documents, Plaintiffs first state that, prior to implementation of the computer system, employees would keep handwritten diaries and regularly go back, input information, and enter the date the work was actually performed as opposed to the date the information was inputted.  Based on this past practice, the Plaintiffs claim that altering the footnote date to accomplish the same end was not improper.

Second, Plaintiffs claim that they received no written or verbal instructions regarding the footnote date, including that altering the date was against company policy.

Third, Plaintiffs claim that the Defendant discovered that employees were altering the footnote date in May, 2001, but did not change the system to prevent these alterations until August 2001.  Thus, according to the Plaintiffs, the Defendant essentially knowingly allowed the practice to continue during this time period.

Finally, Plaintiffs argue that the Defendant did not prosecute any of the Plaintiffs nor report to the Insurance Commissioner for the State of Mississippi or the Mississippi Attorney General that the reason for the Plaintiffs' terminations was the falsification of documents.

The Court finds that none of these arguments, and the scant evidence provided in support

14

thereof, defeats Defendant's legitimate, nondiscriminatory reason for terminating the Plaintiffs.

First, the Court finds that whether or not the Plaintiffs backdated information in their handwritten diaries, prior to implementation of the computer system, is irrelevant. It is undisputed that the CDS system used by the Defendant was designed in such a way that the employee would input a headnote date that could be changed to reflect when the activity actually occurred. The employee would then record all of the information on the screen. The footnote date did not even appear on the screen until all of the information had been inputted and the employee pressed enter. Plaintiffs do not dispute, and do not even address, that the only way the footnote date could be altered was to go through the cumbersome process of prematurely turning off the computer before depressing the enter key. The employee would then have to reboot the computer and wait for the screen to reappear. This glitch in the computer system was accidentally discovered during a power surge by Joan Vines, who was terminated for falsifying company documents and whose termination resulted in the investigation regarding the ability of the footnote to be altered. Based on all of the above undisputed evidence, the Court is not convinced that the Plaintiffs believed it was proper to engage in this process and alter the footnote date.

Moreover, regarding Plaintiffs claim that they were never told this practice was improper, it is undisputed that until the Joan Vines incident, the Defendant thought the footnote date was unalterable. No instruction was provided because the date was not designed or intended to be altered. At oral argument, the Defendant stated that the fixed footnote date was meant to provide protection for both the company and the employee that file information was being documented promptly and accurately. The closer between the date of occurrence and the date of recordation,

15

the greater the likelihood of accuracy.  Tampering with this date calls into question the integrity of the entire file.

Regarding the Plaintiffs allegation that the Defendant did nothing to prevent the Plaintiffs from altering the footnote date from May of 2001 through August of 2001, it is undisputed that the Defendant was conducting its investigation during this period to determine whether and to what extent employees were altering the footnote date.  From the Court's perspective, the Defendant acted responsibly by instituting an investigation, rather than relying on rumors or speculation regarding the problem.  Moreover, given the nation-wide scope of the investigation and the size of the Defendant, three months is a prompt response to the problem.  Until the Defendant understood the scope of the problem, it is unclear what other actions could have been taken.  This includes fixing the problem with the computer program.  It makes no sense for the Defendant to attempt to alter a computer program before it understands what the problem is.

Finally, the Plaintiffs claim that if the Defendant believed they had actually falsified documents, then the Defendant would have sought prosecution of the Plaintiffs and reported that behavior to the Mississippi Insurance Commissioner and the Mississippi Attorney General. Regarding prosecution, Plaintiffs provide no evidence to support that the Defendant always seeks prosecution against employees who falsify documents.  Plaintiffs cite to the Defendant's Code of Ethics which provides in part, "Allstate will seek prosecution of criminal acts perpetrated against the company by an employee or other persons."  Based on this provision, the Plaintiffs claim that the Defendant would have sought prosecution against the Plaintiffs if it truly believed that the Plaintiffs had falsified documents.  However, there is simply no evidence to suggest that the Defendant always seeks prosecution in cases involving the falsification of documents.

Presumably, the Defendant has discretion to determine when it seeks prosecution under specific circumstances. Obviously, the Defendant decided not to seek prosecution in these cases, but found that terminating the Plaintiffs was an adequate punitive measure.

Regarding what was reported to the Insurance Commissioner, the Plaintiff includes a list of points used by one of the Defendant's attorneys, Lori Brouse, to support their claim that the Defendant did not report that the Plaintiffs were terminated for falsifying documents. (Brouse Depo. 29-33, Ex. 22, Pl's Opp.). Exhibit 22 includes the following explanation for the termination of the Plaintiffs, "[t]he dismissals are related to failure to follow company procedures regarding the entry of information into the computer system." Exhibit 22 further includes the following, "[t]he procedures involved the dating of computer entries." These statements correctly reflect what actually occurred. The Plaintiffs seem to suggest that if the Defendant believed the Plaintiffs had falsified documents they would have stated to the Commissioner, "the Plaintiffs falsified documents." The Plaintiffs provide no evidence that the Defendant was required to use this phrase when reporting these occurrences. Rather than giving a generic explanation, the Defendant gave the specific reason for the Plaintiffs' terminations. Plaintiffs provide no evidence of what information was given to the Attorney General. In any event, the Court is not persuaded that either the Defendant's decision not to prosecute the Plaintiffs or the fact that the Defendant stated the specific reason for the Plaintiffs' terminations support the Plaintiffs argument that the Defendant did not really believe that the Plaintiffs had falsified documents.

Accordingly, the Court finds, as a matter of law, that the Plaintiffs have not shown that the Defendant did not really believe that they were falsifying documents. On the contrary, the

17

evidence establishes that not only did the Defendant believe that the Plaintiffs were falsifying documents, but that the Plaintiffs were, in fact, falsifying documents. As such, Defendant acted reasonably and within the guidelines of its written policies by discharging the Plaintiffs.

The Plaintiffs do not dispute, nor even make mention, of the fact that in order to alter the footnote date, they had to engage in a very cumbersome and unusual process. It is clear to the Court that the Plaintiffs do not address this fact because they simply cannot argue that engaging in this practice was appropriate. Moreover, the Plaintiffs argument that engaging in this extraordinary process and changing a date that was designed to be unalterable somehow does not constitute falsifying a document strains logic. The footnote date was designed to reflect the date that the information was entered and only appeared on the screen after the employee depressed the enter key. Common sense dictates that going back into the document and changing the date results in entering false information and altering a document. Plaintiffs never address this issue directly and, thus, as a matter of law, cannot meet their burden and show that the Defendant's legitimate, nondiscriminatory reason for the terminations is merely a pretext for age discrimination.

The Court now turns to the Plaintiffs allegations that the Defendant's hirings around the time of the Plaintiffs' terminations support a finding of age discrimination and similarly situated younger employees were treated differently from the Plaintiffs. As the Court indicated above, these two arguments go to the Plaintiffs' mixed-motive argument. Thus, the Court will consider whether the Plaintiffs can show that the Defendant's reason, while true, was only one of the reasons for its conduct, and another motivating factor was the Plaintiffs' ages.

**2. Whether Defendant's hirings around the time of the Plaintiffs' terminations support a**

18

**finding of age discrimination?**

Without citing a single piece of evidence, Plaintiffs ask the Court to speculate that certain unsubstantiated hirings made by the Defendant support a finding of age discrimination. First, Plaintiffs state that in March of 2002, three months prior to their termination in June of 2002, the Defendant closed its office in Little Rock, Arkansas. Plaintiffs concede that the Defendant was going through a reduction in force during this time and also closed offices in Lafayette, Baton Rouge, and Metairie. Without providing any evidence or explaining how this unsupported fact might be relevant, Plaintiffs claim that the closing of the Little Rock office required a number of younger employees to move from Arkansas to the Jackson office. Plaintiffs go on to state that one of these younger employees replaced Plaintiff Wells. Plaintiffs do cite to a handwritten note from one of the Defendant's attorneys, Nolan Burkhouse, wherein he questions whether some of the Plaintiffs are being let go because of the closing in Little Rock. (Ex. 26, Pl's Opp.). The Plaintiffs make no attempt to explain how a corporate decision to close an office and relocate employees to other offices has any relationship to their age discrimination claims. Moreover, if the answer to Mr. Burkhouse's question regarding whether some of the Plaintiffs were terminated because of the closing of the Little Rock office were affirmative, such a decision is not illegal and the Plaintiffs provide absolutely no evidence to support that age had anything to do with moving some of the Little Rock employees to the Jackson office.[5]

Furthermore, Plaintiffs give a list of ages of claims adjusters who were hired prior to the

---

[5]It is well settled that employment decisions based on factors other than age do not violate the ADEA. *Hazen Paper Co. v. Biggens*, 507 U.S. 604, 610-11) (1993) (observing that an ADEA claim must fail unless the employee's age actually played a role in the termination and had a determinative influence on the outcome).

filing of the age discrimination claim and a list of ages of hires after the filing of the age

discrimination claim. Plaintiffs claim that prior to the filing of the claim, the Defendant hired 10

adjusters, 8 of whom were under the age of 40, 1 of whom was 40, and one of whom was 46.

Plaintiffs then claim that after the filing of the age discrimination claims, the next 11 hires of

adjusters included 4 over the age of 40 and 7 under the age of 40. The Plaintiffs claim that these

numbers support their theory that the Defendant only hired applicants over the age of 40 after

they filed their age discrimination claims. The Court notes first that the Plaintiffs provide no

evidence to support any of these allegations. The Court is confident that the Plaintiffs understand

their evidentiary burden in opposing a motion for summary judgment and, thus, will not go into

great detail in explaining that they cannot meet that burden by making unsubstantiated

allegations in an attempt to create an issue of material fact. The Court notes, however, that even

if Plaintiffs had provided evidence that these ages were accurate, the Plaintiffs provide no context

to explain how these numbers evidence age discrimination. What were the ages of other

applicants? What were the job descriptions of the positions being filled? Taken out of context,

the numbers are meaningless.

   Plaintiffs cite the Court to *Walther v. Lone Star Gas Company*, 952 F.2d 119 (5th Cir.

1992), for the proposition that the Court may consider circumstantial evidence in its analysis in

this case. The Court agrees that it can consider circumstantial evidence in an age discrimination

case, however, the Plaintiffs here present no evidence for the Court to consider, circumstantial or

otherwise. Accordingly, the Court finds that the Plaintiffs have failed to show that the alleged

hirings around the time of Plaintiffs' terminations create a material fact regarding the

Defendant's motives.

**3. Whether similarly situated younger employees were treated differently from Plaintiffs?**

In this section, Plaintiffs attempt to create a genuine issue of material fact by speculating that younger employees were treated differently from the Plaintiffs. "The ADEA was not intended to be a vehicle for judicial second-guessing of employment decisions, nor was it intended to transform the courts into personnel managers." *Bienkowski*, 851 F.2d at 1507-1508 (5th Cir. 1988). The appropriate question in an age discrimination case is whether the Plaintiffs were treated differently from another employee outside of the protected class under "nearly identical circumstances." *Wyvill v. United Companies Life Ins. Co.*, 212 F.3d 296, 304-305 (5th Cir. 2000).

Here, Plaintiffs attempt to show that certain employees engaged in the practice and were not terminated. However, the Defendant determined during its investigation that some employees were shown how to engage in the process, but did not engage in the process. In particular, Plaintiffs claim that Marguerite Lowery and Renee Honda, both of whom were over 40 during the relevant times, both admitted to having "hits." Based on its investigation, the Defendant determined there was not sufficient proof to terminate either of these employees because they were not managers and they did not use the process. The facts indicate that the Plaintiffs are not similarly situated to these two employees. "[T]he conduct at issue is not nearly identical when the difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer." *Wallace v. Methodist Hospital System*, 271 F.3d 212, 221 (5th Cir. 2001). In this case, the numbers of hits attributable to the respective Plaintiffs indicates that they purposefully engaged in the process as opposed to those employees who had one or very few hits. Those few hits could be explained by

21

Joan Vines showing the employee how to alter the footnote date or lack of knowledge about the computer program. Thus, the Court finds that the conduct of the Plaintiffs accounts for the difference in treatment. The Court also notes that both Lowery, aged 41 at the time, and Honda, aged 47 at the time, are in the protective class. Thus, if the Defendant had been motivated by age, it seems that they would have terminated these employees as well.[6]

The Plaintiffs simply have not produced evidence to support a finding that age played any part in their firings. In a Motion for Summary Judgment, the burden of demonstrating the existence of a genuine issue is not met by "metaphysical doubt" or "unsubstantiated assertions." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Rather, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Willis v. Roche Biomedical Laboratories, Inc.*, 61 F.3d 313, 315 (5th Cir. 1995). Overwhelmingly, Plaintiffs support their arguments with "unsubstantiated assertions."

As such, the Court GRANTS the Defendant's Motion for Summary Judgment regarding the ADEA claims.

## II. FAIR LABOR STANDARDS ACT

Plaintiffs seek overtime compensation from the defendant under the FLSA, 29 U.S.C. §§ 201-206, for hours worked in excess of 40 hours per week. The FLSA requires employers to pay overtime compensation to employees who work more than 40 hours per regular workweek. 29

---

[6]The Plaintiffs also claim that two managers, Paul Duff and Bruce Smith knew of the practice and failed to report it, which is the exact conduct for which Defendant terminated Plaintiff Wells. However, the Plaintiffs provide no evidence to support its claim that either of these two employees had knowledge of the practice.

U.S.C. § 207; *Lott v. Howard Wilson Chrysler-Plymouth, Inc.*, 203 F.3d 326, 331 (5th Cir. 2000).

However, the FLSA excludes from the requirement those employees working in a bona fide

executive, administrative or professional capacity. 29 U.S.C. § 213 (a)(1); *Lott,* 203 F.2d at 331.

Although historical facts regarding employment history and inferences based on these facts are

considered, the ultimate decision whether the employee is exempt from the FLSA's overtime

compensation provisions is a question of law. *Smith v. City of Jackson, Mississippi*, 954 F.2d

296, 298 (5th Cir. 1992) (*citing Dalheim v. KDFW-TV*, 918 F.2d 1229 (5th Cir. 1990)).[7]

> The Fifth Circuit instructs that in deciding whether an employee is exempt the court must:
>
> (1) assert findings of historical fact, which include such findings as whether the employer controlled the number of hours the employee worked;
>
> (2) make inferences from the facts in applying the regulations and interpretations promulgated under 29 U.S.C. 213(a)(1); and
>
> (3) make the ultimate determination of whether an employee was exempt.

*Lott,* 203 F.2d at 331. Thus, whether an employee is exempt is properly determined on a motion

for summary judgment. *See e.g., Smith v. City of Jackson, Mississippi*, 954 F.2d 296 (5th Cir.

1992) (affirming district court's findings of employment status under the FLSA). Exemptions

are to be narrowly construed. *Vela v. City of Houston*, 276 F.3d 659, 666 (5th Cir. 2001). The

---

[7]Judge McNamara has noted that at first blush this standard appears contradictory, however, the court first makes findings of historical fact, like employment history, and then applying the applicable law to those findings, the court determines as a matter of law whether the employee is exempt. *Johnson v. Home Team Productions, Inc.,* 2004 WL 1586552 (E.D.La. 2004).

Chief Judge Wingate of the Southern District of Mississippi succinctly articulated the standard: "The question of how [the plaintiff] spent his working time is a question of fact, but whether his particular activities excluded him from the overtime requirements of the FLSA is a question of law." *Edwards v. Audubon Ins. Group, Inc.,* 2004 WL 3119911 (S.D.Miss. 2004).

burden of proving the applicability of a claimed exemption is on the employer. *Id.*

In this case, the Defendant claims that all of the Plaintiffs, except for Ladd and Stegall[8] and Gilbert and Wells,[9] are exempt from overtime compensation requirements under the administrative exemption.[10] Thus, the issue before the Court is whether the plaintiffs' job duties satisfy the requirements of the administrative exemption.

The FLSA delegates to the Secretary of Labor broad authority to define and delimit the scope of the administrative exception. 29 U.S.C. § 213(a)(1); *McLaughlin v. Nationwide Mutual Ins. Co.*, 2004 WL 1857112, *2 (D.Or. 2004). The DOL has issued regulations interpreting the exemption for administrative employees to which the district court must give due deference. *Auer v. Robbins*, 519 U.S. 452, 461 (1997).

**A. Administrative Exemption**

The DOL regulations outline a "long" and "short" test for determining administrative employee status.[11] *See* 29 C.F.R. § 541.2(a)-(e) ("long test") and 541.214 ("short test"); *see also Martin v. Cooper*, 940 F.2d 896, 901 and 901 n.4 (3d Cir. 1991). The short test applies to

---

[8]The parties do not dispute that these two employees are non-exempt employees. In their brief, Plaintiffs ask the Court to grant summary judgement on the behalf of these two employees. However, the Plaintiffs have not moved the Court for summary judgment. As there is no dispute regarding these Plaintiffs, however, they have no claim under the FLSA. Accordingly, their FLSA claims should be dismissed.

[9]Plaintiffs concede that Gilbert and Wells are exempt as managers and thus their FLSA claims should be dismissed.

[10]The Plaintiffs who assert FLSA claims are Cheatham, McCoy, Parham, Johnston, Kitch, Peoples, and Anthony.

[11]The regulations were revised effective August 23, 2004. Because this case predates the change, the prior regulations govern the case and are cited herein and by the parties. The revision did not change the criteria for the administrative exemption.

employees who are compensated at a rate of not less than $250 per week and requires that the employee's duties include work involving the use of discretion and independent judgment. *McLaughlin*, 2004 WL 1857112, *2.  The parties do not dispute that the short test applies to this case.[12]

Under the short test, an employee employed in a bona fide administrative capacity is any employee (1) who is compensated on a "salary basis" at a rate of at least $250 per week; and (2) whose primary duty consists of "office or nonmanual work directly related to management policies or general business operations of his employer or his employer's customers," and (3) requires "the exercise of discretion and independent judgment."  29 C.F.R. § 541.2(e)(2) and (e)(1); *Lott*, 203 F.2d at 331.

There is no dispute that the plaintiffs meet the salary test–they were each paid on a salary basis far more than $250 per week.  Specifically Anthony's annual salary was $82,920, Parham's annual salary was about $82,900, Peoples' annual salary was $71,508; Cheatham's annual salary was $53,712, Johnston's annual salary was bout $67,000, McCoy's annual salary was about $72,000, and Kitch's annual salary was $59,316.  all of these employees testified that their respective salaries had never been docked.

The more analytically difficult part of the short test is known as the "duties test." *McLaughlin*, 2004 WL 1857112, *2 (citing *Webster v. Public School Employees of Washington, Inc.*, 247 F.3d 910, 914 (9th Cir. 2001).  The parties do not dispute that the plaintiffs performed

---

[12]The "long" test applies to employees who make less money and requires that an employee "customarily and regularly" exercise discretion and independent judgment. In contrast, the short test requires only that an employee's duties *include* work involving the use of discretion and independent judgment.

primarily "office or nonmanual work" as required under 29 C.F.R. § 541.2(a)(1). In their brief, the Plaintiffs argued that their primary duties was not directly related to management policies and general business operations of the Defendant. However, at oral argument, the Plaintiffs conceded that their duties did satisfy this prong. Thus, the only question for the Court to resolve is whether the plaintiffs duties include work requiring the exercise of discretion and independent judgment.

## B. Exercise of Discretion and Independent Judgment

The exercise of discretion and independent judgment necessitates consideration and evaluation of alternative courses of conduct and taking action or making a decision after the various possibilities have been considered. *Lott*, 203 F.3d at 331 (citing 29 C.F.R. § 541.207(a)). This exercise of discretion and independent judgment must relate to matters of consequence. *Id.* (citing 29 C.F.R. § 541.207(b)-(c)(1). However, the DOL has also clarified that "discretion and independent judgment" does not necessarily imply that an employee's decisions must "have a finality that goes with unlimited authority and a complete absence of review":

> The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised does not mean that the employee is not exercising discretion and independent judgment.

29 C.F.R. § 541.207(e)(1).

## C. Duties of Plaintiffs

Here, all of the Plaintiffs were adjusters. Christine Sullivan, Assistant Vice-President in the claims department of Allstate testified in her affidavit that the purpose of claims adjusting is to place an insured who suffers a covered loss in their pre-loss condition, while assuring that Allstate does not pay more or less than is appropriate. (Sullivan Aff.,Ex. A, Def's Mtn.).

26

The Plaintiffs were not all the same types of adjusters.[13]  Anthony, Parham, Peoples, Johnston, and Cheatham were casualty or liability adjusters.  They handled liability claims for bodily injury and damage to property, including first-party medical claims under auto policies and uninsured or underinsured motorist claims.  McCoy was a special investigation unit adjuster. The Special Investigations Unit is Allstate's specialized group of adjusters who handle fraudulent and potentially fraudulent claims.  Kitch was a property adjuster who handled all types of homeowner damage, including damages caused by water, fire, lightning, wind, and hail.  He also handled some boat claims.

Defendants claim that the duties performed by the adjusters fit squarely within the administrative exemption as outlined above.  In contrast, Plaintiffs claim that they are not exempt because their work is not directly related to Allstate's management policies or general business operations, plaintiffs are engaged in production as opposed to serving work, and plaintiffs did not exercise independent judgment and discretion.  The gravamen of Plaintiffs' argument is that, while adjusters might have fit into the exemption in the past, Allstate's institution of a "tightly controlled system of practices and procedures," known as "Core Claim Process Redesign" ("CCPR"), took away the discretion and independent judgment adjusters used to exercise.

**1. Casualty adjusters (Anthony, Parham, Peoples, Johnston, Cheatham):**

As stated above, these adjusters handled liability claims for bodily injury and damage to property.  Their duties can be gleamed from their testimony[14] in their various depositions which

---

[13]The parties seem to agree that the work performed by the plaintiffs in these different categories was substantially the same.

[14]In their brief, Plaintiffs use Anthony as an exemplar to describe the duties performed by the Plaintiffs.  As such, where appropriate, the Court cites to specific examples from Anthony's

are part of the record and which can be broken down into the following categories:

1.  Setting and/or adjusting reserves based upon his/her preliminary evaluation of the case. (Anthony, 39[15]; Parham, 37; Peoples, 38-39, Johnston 34-35).

2.  Investigating issues that relate to coverage and determining the steps necessary to complete a coverage investigation. (Anthony, 28, 35-36; Parham 16-20; Peoples, 39-40; Cheatham, 19-20; Johnston 8-10).

3.  Determining whether coverage should be approved or denied, with only denials of coverage subject to supervisory approval. (Parham 16-20;Peoples, 39-40; Cheatham, 19-20; Johnston 8-10).

4.  Conducting an investigation (including interviewing witnesses and making credibility determinations) to determine liability. (Anthony, 18-19, 37-38;[16] Johnston 10-11).          5. Consulting local traffic and negligence laws and applying those laws to the facts of the claim to determine who was at fault. (Anthony, 42-44; Cheatham, 20-21; Johnston 19-20).

_____

deposition testimony.

[15]Anthony testified:
A: "[W]e had to set the reserve based on what we felt like the ultimate payout on the claim is going to be.
Q: I take it you based that on your evaluation of the file?
A: Yeah.
Q: Did that have to go through any sort of computer analysis?
A: Not the reserve, no.
Q: That was set based on your experience?
A: That was based on my experience.

[16]On pgs. 37-38, Anthony explained that he was responsible for reviewing the liability investigation. Based on his review, if he believed that the investigation was not done properly or completely, he made the decision to redo the investigation. Based on his investigation, he would write his own liability assessment.

6. Determining whether a claim has subrogation potential, (Parham, 38-39; Peoples, 40-41; Cheatham, 28).

7. Identifying underwriting risks. (Parham, 39-40; Cheatham, 30).

8. Identifying potentially fraudulent claims. (Anthony, 40; Parham, 37; Peoples 43-45; Cheatham, 28-30; Johnston, 36-37).

9. Determining liability and apportioning fault to parties in comparative negligence cases. (Anthony 18, 36-38; Parham, 22-25, 30; Peoples 20, 22-27; Cheatham, 16, 20-21, 33-34; Johnston, 8-9; 10-11; 18-20, 37-38).

10. Determining the value of claims based upon many factors such as the claimant's credibility, age, gender, together with any physical injury or property damage, the reputation of the attorney representing the claimant, litigation costs, and venue. (Anthony, 25-28;[17] Parham, 21-25, 28-29, 44-47; Peoples, 29-33; Cheatham 16, 21-23; Johnston, 27, 28-33).

11. Negotiating a final settlement with the claimant/claimant's attorney that was binding upon Allstate. (Anthony, 28-29;[18] Parham, 40; Peoples 28, 37-38; Cheatham 24-26; Johnston, 8, 33-34).

12. Additionally, Anthony and Parham handled litigated files where the claimant was

---

[17]Anthony testified that the software package did not take into account certain subjective factors like the credibility of the claimant. Thus, Anthony would assess this factor himself based on his experience as he would the reputation of the attorney and venue. He testified that he included these factors in his own assessment of what the claim was worth.

[18]Anthony testified as follows:
Q: What was your role in negotiating the settlement of claims?
A: I was the negotiator. I settled.
Q: You were the person from Allstate that either the claimant or their attorney dealt with?
A: Yes.

represented by an attorney, also (1) served as Allstate's representative, attended court hearings, mediations, settlement conferences, and trials, and (2) worked directly with and made recommendations to, Allstate's defense counsel about the handling of the case, approving expenses and assisting in the development of litigation plans, sometimes including the development of discovery plans. (Anthony, 18, 26, 29-34;[19] Parham, 16, 41-44).

### a. Independent Judgment and Discretion

Plaintiffs claim that the CCPR stripped them of their use of discretion and independent judgment. Under the short test which is applicable here, the Court must determine whether the plaintiffs duties *include* work requiring the exercise of independent judgment. While Plaintiffs concede that the short test is applicable, they attempt to argue that the "long test" standard must be met in this case: namely, that plaintiffs must "customarily and regularly" exercise discretion and independent judgment. This is a misstatement of the law and is not the appropriate standard in the case.

Based on the above outline of the Plaintiffs duties, there is no doubt that the Plaintiffs' duties included work requiring the exercise of independent judgment despite the use of guidelines and computer programs. The plaintiffs testimony established that they exercised discretion in determining coverage, conducting investigations, determining liability and assigning percentages of fault to parties, evaluating bodily injuries and negotiating a final settlement. Moreover, the plaintiffs used their judgment and experience in setting and adjusting reserves

---

[19]In his own words, Anthony described his job duties: "It required handling litigation files, which was working with defense counsel on, you know, the best course of action to provide service for our policyholder, to protect our policyholder. I also had to evaluate the liability investigation, make sure it was correct; but basically, the majority of my dealings was evaluation, negotiation, or litigate." Pgs. 18:21-19:3.

based upon the preliminary evaluation of the case; investigating issues that relate to coverage and determining the steps necessary to complete a coverage investigation; determining whether coverage should be approved or denied, etc.  With regard to the function of negotiation, Chief Judge Wingate of the Southern District of Mississippi had held that "the act of negotiating itself involves the exercise of discretion and judgment." *Edwards v. Audubon Ins. Co. Group.*, 2004 WL 3119911 (S.D.Miss. 2004).

Plaintiffs argue that the use of CCPR and the software programs stripped the Plaintiffs of their discretion and independence.  In support of this argument, Plaintiffs rely mainly on three pages of Anthony's deposition.  (Anthony Ex., Pl's Opp.).  The excerpted testimony, however, relates to only a portion of the work that Anthony described that he did in his position.  Even though he testified that the software program generated an evaluation of the claim, he still used discretion in determining the data to input into the program, in negotiating settlements with claimants, in working with attorneys on litigated files, in conducting investigations and deciding based on his experience what aspects of the cases were important.  Plaintiffs provide no evidence to rebut that these activities fall under the administrative exemption.

Plaintiffs rely on the reasoning of the court in *Robinson-Smith v. Government Employees Insurance Company*, 323 F.Supp.2d 12 (U.S.D.C. 2004), wherein the court found that automobile damage adjusters did not exercise sufficient discretion and independent judgment. This case is distinguishable from the case at bar because those adjusters dealt solely with physical damage to cars.  Several courts have found that these type of adjusters are not exempt because their duties involve applying "well-established techniques, procedures or specific standards described in manuals or other sources" and that the computer program aids in

31

compliance with those standards. "Significantly, in most cases, a vehicle's VIN number tells the CR almost everything there is to know about the vehicle involved. Vehicle damage is finite and limited to the value of a known entity from standard sources." *In re Farmers Ins.*, 300 F.Supp.2d 1020, 1028 (D.Or. 2003). Objective damage to property is not analogous to assessing whether bodily injury claims fall within coverage under a policy.

Plaintiffs also seem to argue that they merely filled out forms which lead to conclusions, thus not requiring the exercise of discretion and independent judgment. The plaintiff in *Jastremski* made the same argument, which the court rejected. The court stated:

> When plaintiff was assigned a claim, he verified coverage of the claim under the insured's policy, either using his own judgment or using the help of managers or underwriters. If the claim was covered, he usually planned how to investigate it. Plaintiff had discretion in deciding how to conduct the investigation, including gathering facts, interviewing witnesses, using field representatives, and compiling scene diagrams. Plaintiff also negotiated settlements to claims, and had discretion in deciding which negotiation tactics to use. Plaintiff had full authority to settle any claim within his commitment authority, with no supervisory approval.

*Jastremski*, 243 F.Supp.2d at 757. Based on the above, the court concluded that filling out forms was ancillary to the plaintiff's job duties involving the use of discretion and independent judgment. *Id.*

The case at bar is analogous to the *Jastremski* case. While the plaintiffs in the instant matter may have had to seek approval to settle a claim, the other duties are virtually identical. Moreover, in seeking approval they were expected to make a recommendation based on their experience and knowledge of the case and to explain their reasons for their recommendation.

Regarding manuals and guidelines, courts considering the issue have found as a matter of law that even if an employee is required to follow detailed manuals, that does not mean that he

did not exercise discretion and independent judgment. *McAllister v. Transamerica Occidental Life Ins. Co.*, 325 F.3d 997, 1001 (8th Cir. 2003); *Edwards*, 2004 WL 3119911 at * 7.  In fact the new DOL regulations concur with this conclusion:

> The use of manuals, guidelines, or other established procedures containing or relating to highly technical, scientific, legal, financial or other similarly complex matters htat can be understood or interpreted only by those with advanced or specialized knowledge or skills does not preclude exemption under section 13(a)(1) of the Act or the regulations in this part.  Such manuals and procedures provide guidance in addressing difficult or novel circumstances and thus use of such reference material would not affect an employee's exempt status.

New Reg. 29 C.F.R. § 541.704.  Responding to the same argument, the McLaughlin court noted: "Virtually every employee in America has one or more managers and must follow company policies, procedures and guidelines.  The DOL and the court have made it absolutely clear that the fact that an employee has his work reviewed or follows guidelines does not defeat exempt status under the FLSA." *McLaughlin* at 11.

Plaintiffs state that after the implementation of CCPR, they became nothing more than date clerks.  However, they provide no evidence in support of this conclusion or to rebut the testimony of the plaintiffs themselves.

Thus, the Court finds that these employees are exempt under the FLSA.

Accordingly, the Defendant's Motion for Summary Judgment as to the casualty adjusters is GRANTED.

## 2. Special Investigation Unit Adjuster (McCoy):

Plaintiffs do not address the duties performed by McCoy in contrast to the casualty adjusters.  The Special Investigation Unit is Allstate's specialized group of adjusters who handle fraudulent and potentially fraudulent claims.  McCoy's primary duties were to handle potentially

fraudulent auto and homeowner claims.  (McCoy, 25).  These duties included:

    1.  Investigating the alleged fraud.  (McCoy, 26).

    2.  Obtaining a statement from the insured regarding the circumstances surrounding the loss. (McCoy, 26-27).

    3.  Conducting a field examination where appropriate, which generally involved interviewing witnesses and/or investigating the damaged property.  (McCoy, 27, 28-32).

    4.  Retaining a cause and origin expert as needed to prepare a report regarding the cause of the loss (McCoy, 28-29, 32-34).

    5.  Making final coverage recommendations to his manager, which were approved more often than not (McCoy, 34, 35).

In his own words, McCoy at some point would "make the call as to whether you felt like it was a legitimate claim or not." (McCoy, 27:23-25).  Applying the facts to the law outlined above, McCoy would also fall into the administrative exemption.  Like the casualty adjusters, McCoy was involved in determining coverage, conducting an investigation, determining liability, and assessing credibility.  These activities require the exercise of discretion and independent judgment.

Accordingly, the Defendant's Motion for Summary Judgment against McCoy is GRANTED.

**3.  Property Adjuster (Kitch):**

Kitch worked as a property adjuster handling all types of homeowner damage, including damages caused by water, fire, lightning, wind, and hail.  (Kitch, 13).  He also handled a very small number, no more than 5% of his total load, of boat claims.  (Kitch, 34).  His duties

included:

    1. Determining what caused the loss by examining the damage and going through a process of elimination, or, in cases where he determined an expert was needed, retaining an engineer or cause and origin expert to give him guidance. (Kitch, 14-15, 56-58).

    2. Making coverage determinations, that is, decisions about whether the loss was covered or excluded by the language of the policy. (Kitch, 13, 56, 60).

    3. Inspecting the loss, taking photographs and measurements, assembling a calim file, and writing an estimate. (Kitch 13-14).

    4. Estimating the value of covered losses and damages. (Kitch, 13).

    5. Negotiating a settlement of claims within his authority, on site whenever possible. (Kitch, 13-14, 27).

    6. Determining whether fraud was involved using his background as a police officer. (Kitch 37-40).

    Proper adjusters use a computer program called Accupro to estimate property damage and a program called CED to estimate contents loss. Defendants claim , and Kitch's testimony establishes, that he was able to override the estimates made by these programs and assess the reasonableness of the estimate generated by the system. For example, Kitch testified that the computer programs could not provide estimates for electrical or plumbing work, nor could it provide estimates for damages to unique construction features. (Kitch 20-22, 24).

    Plaintiffs claim that Kitch is not exempt because of the constraints provided by the computer programs and based on the reasoning of the cases dealing with automobile claim adjusters. However, those cases just apply to auto adjusters whose duties were very different

35

from Kitch's.  Based on Kitch's testimony, his duties were substantially similar to the other

Plaintiffs.  Accordingly, Defendant's summary judgment motion against Kitch is GRANTED.[20]

## III.  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Defendant moves for summary judgment on the plaintiffs' emotional distress claims,

arguing that the complained of behavior does not rise to the level of intentional infliction of

emotional distress under Mississippi law.

### A.  Factual Background

Plaintiffs claim they are entitled to damages for intentional infliction of emotional distress

due to alleged false accusations of falsification of company documents, the way in which they

were fired and telling other people in the insurance industry that these plaintiffs were fired for

falsifying company documents.  Some of the plaintiffs apparently deny that they falsified

documents.  However, the main thrust of plaintiffs argument involves the way in which they

were terminated.  The Plaintiffs were summoned to a hotel and met in a conference room.  Most

of the interviews were conducted by two outside counsel and two members of the corporate

security department.  Defendants state that the interviews last about the thirty minutes.  An armed

security guard  was present outside the hotel conference room.

Plaintiffs claim that this environment made them feel like criminals.  They also stated that

they were not allowed to get their personal belongings and that the tone of the interviews was

---

[20]As the Court grants the Defendant's Motion for Summary Judgment on the FLSA claims,
the Court need not consider the Plaintiffs' third claim for damages due to the Defendant's failure to
timely pay overtime compensation benefits.  However, it is unclear what the parties have agreed
concerning the undisputed non-exempt employees, Ladd and Stegall.  The Court dismisses their
FLSA claims, as there is no dispute that these Plaintiffs are covered under the FLSA.  If necessary,
whether or not a claim for failure to pay overtime benefits remains for Ladd and Stegall will be dealt
with by motion at a later date.

disrespectful and rude. Even viewing the evidence in the light most favorable to the plaintiffs as required in a motion for summary judgment, the actions of the Defendant do not rise to the level of intentional infliction of emotional distress as a matter of law.

The Plaintiffs also state that the Defendant did not stop at just terminating these employees, but made sure that their careers in the insurance industry were over. In support of this allegation, Plaintiffs state that, following their termination, an employee of Allstate, Travis Tigrett, spoke with an employee of Progressive. Plaintiffs allege that Tigrett told the Progressive employee about the firings. They also claim that another Allstate employee, Marguerite Lowery, spoke with an attorney and told the attorney about the firings. Plaintiffs claim that this constitutes defamation, but make no attempt to show how. They also do not explain how the conversations of these employees can be attributed to Allstate. Nonetheless, this action does not rise to the level of intentional infliction of emotional distress.

## B. Legal Standard

It is well settled under Mississippi law, that the standard for intentional infliction of emotional distress is very high. *Hatley v. Hilton Hotels Corp.*, 308 F.3d 473 (5th Cir. 2002); *Speed v. Scott*, 787 So.2d 626 (Miss. 2001); *Lee v. Golden Triangle Planning & Development District, Inc.*, 797 So.2d 845 (Miss. 2001); *Burroughs v. FFP Operating Partners, L.P.*, 28 F.3d 543 (5th Cir. 1994); *White v. Walker*, 950 F.2d 972 (5th Cir. 1991); *Pegues v. Emerson Elec. Co.*, 913 F.Supp. 976 (N.D. Miss. 1996); *Brown v. Inter-City Federal Bank*, 738 So.2d 262 (Miss. Ct. App. 1999); *Raiola v. Chevron U.S.A., Inc.*, 872 So.2d 79 (Miss. Ct. App. 2004); *Clark v. Luvel Diary Products, Inc.*, 821 So.2d 827 (Miss. Ct. App. 2002). The defendant's conduct must be wanton and wilful and such that it would evoke outrage and revulsion. *Hatley,* 308 F.3d at 476

37

(citing *Leaf River Forest Prods. Inc. v. Ferguson*, 662 So.2d 648, 659 (Miss. 1995). "A Mississippi federal court defined the necessary severity as acts so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quoting *Speed*, 787 So.2d at 630). Liability for intentional infliction of emotional distress does not extend to mere insults, indignities, threats, annoyances, petty oppression or other trivialities. *Brown*, 738 So.2d at 265.

A claim for intentional infliction of emotional distress will not ordinarily lie for mere employment disputes. *Lee*, 797 So.2d at 851 (citing *Pegues*, 913 F.Supp. at 982). "Recognition of a cause of action for intentional infliction of emotional distress in a workplace environment has usually been limited to cases involving a pattern of deliberate, repeated harassment over a period of time. *Id.* "Only in the most unusual cases does the conduct move out of the realm of an ordinary employment dispute into the classification of extreme and outrageous as required for the tort of intentional infliction of emotional distress." *Brown*, 738 So.2d at 265 (citing *Prunty v. Arkansa Freightways, Inc.*, 16 F.3d 649 (5ᵗʰ Cir. 1994).[21] "It is the nature of the act itself–not the seriousness of its consequences that gives impetus to legal redress. *Lee*, 797 So.2d at 851.

Moreover, courts have found that while an employer's actions might violate the Age Discrimination in Employment Act or Title VII, those same actions do not necessarily become intentional infliction of emotional distress. *Hatley*, 308 F.3d at 476 (Title VII claim for sexual harassment); *Ramirez v. Allright Parking El Paso, Inc.*, 970 F.2d 1372, 1375 (5ᵗʰ Cir. 1992) (ADEA–applying Texas law re intentional infliction of emotional distress).

---

[21]The *Prunty* case applies Texas law, but several Mississippi courts have cited to it approvingly.

In *Ramirez*, the Fifth Circuit determined that a former general manager of a parking company failed to state a cause of action for intentional infliction of emotional distress against his employer (under Texas law), despite allegations that the employer's 22 year old vice president fired the plaintiff and replaced him with a 22 year old worker; that the plaintiff was reinstated as general manger after the vice president was reminded of the ADEA, but with loss of seniority and at a lower salary than agreed to by the parties; that shortly after the plaintiff was reinstated, the employer demoted him to duty as a parking lot attendant, requiring him to work longer hours than other attendants and more weekends than other supervisors; that the plaintiffs 22 year old replacement told him he would be put on hourly wage and required to punch a time clock; and that he was then fired after he refused to accept the hourly position and time clock requirements. *Ramirez*, 970 F.2d at 1376. The Fifth Circuit held that the employer's actions, though perhaps illegal and discriminatory, did not support a finding of extreme and outrageous conduct since the employer did not subject the plaintiff to intentional and systematic degradation and humiliation. *Id.*

Allegations of upsetting or unreasonable behavior have not been sufficient to state a cause of action for intentional infliction of emotional distress. *Brown*, 738 So.2d at 264-65 (finding that bank president's periodically asking plaintiff how old she was and when she was going to retire may have been upsetting and inappropriate, but did not constitute intentional infliction of emotional distress). Likewise, allegations that an employer made inappropriate comments to and/or falsely accused an employee of theft and lying have been held insufficient to support an intentional infliction of emotional distress claim. *Raiola*, 872 So.2d at 85-86; *Speed*, 787 So.2d at 630-31. In *Raiola*, the plaintiff claimed that he was wrongfully terminated and that his

39

employer called him a thief and made inappropriate remarks about his Italian heritage. *Raiola*, 872 So.2d at 85-86. In *Speed*, the plaintiff also claimed that his employer called him a thief and a liar. 787 So.2d at 630-31. In both cases, the court found that this type of behavior was not sufficient. Similarly, in *Clark v. Luvel Dairy Products, Inc.*, the court held that a company president's statement to the plaintiff that the company had evidence that the employee was stealing and selling inventory, together with the president's directive to the employee to leave the premises and not to return, did not give rise to liability for intentional infliction of emotional distress. 821 So.2d 827, 829, 831 (Miss. Ct. App. 2001).

Plaintiffs allegations in this case do not constitute intentional infliction of emotional distress. Even if the defendant wrongly terminated these employees, such action constitutes an ordinary employment dispute, not outrageous conduct. Moreover, the presence of an armed guard and the prohibition against returning for personal belongings after termination are commonplace when employees are fired. Particularly when there are allegations of fraud or dishonesty and emotions are involved, as was the case here. Plaintiffs conclusion that they were slandered is without merit. They do not make a separate claim for slander and do not attempt to prove that the alleged comments constitute slander. Rather, they ask the Court to accept their conclusion and on that basis find intentional infliction of emotional distress.

Most of the cases cited by the Plaintiffs are from the 1920's and 30's and relate to slander, not intention infliction of emotional distress. These cases are irrelevant.

In the alternative, plaintiffs claim that it is premature for the Court to rule on these claims. Plaintiffs state that if the ADEA and FLSA claims survive summary judgment, then the facts supporting those claims can support a claim for intentional infliction of emotional distress. As

noted above however, even illegal or inappropriate conduct does not necessarily rise to the level of intentional infliction of emotional distress.  Plaintiffs simply cannot meet their burden.

For the above reasons, the defendants motion for summary judgment on the plaintiffs claims for intentional infliction of emotional distress should be granted and these claims should be dismissed.

## IV.  CONCLUSION

For the foregoing reasons, the Court hereby GRANTS the Motion of the Defendant for Summary Judgment.  Plaintiffs claims are DISMISSED with prejudice.

New Orleans, Louisiana
This ___ day of May, 2005

United States District Judge